### WILLIAM B. WALKER *et al.*
#### *v.*
### THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 24, 1901.*

INHERITANCE TAX—*method of arriving at value of shares of stock in corporations.* The fair market value of shares of stock in corporations, under the Inheritance Tax law, is not what they would bring on a forced sale if all should be put on the market at once, but what they would bring at a sale at or about the time of the testator's death, after due notice, under fair conditions and in the ordinary course of business; and in arriving at such value the appraiser and court are not limited to market quotations, but may consider quotations on the public exchanges, private sales, testimony as to actual value and their own knowledge of the subject.

APPEAL from the County Court of Cook county; the Hon. CARL E. EPLER, Judge, presiding.

This is an appeal from a judgment of the county court of Cook county, affirming the appraisement of the county judge of Cook county, fixing the cash value of the estates, annuities and life estates, growing out of the estate of Silas B. Cobb, deceased, and the inheritance taxes to which they are liable.

The appraiser, appointed by the county judge under the provisions of the Inheritance Tax law to appraise the estate of Silas B. Cobb, deceased, filed with the county judge, on October 3, 1900, his report as such appraiser

in which he found the total value of the estate to be the sum of $6,700,217.46. The county judge thereafter found the value of said estate to be the sum of $6,700.217.46, and entered an order, fixing the value of each beneficiary's interest therein together with the tax payable thereon. From this order of the county judge appellants appealed to the county court. Thereafter, the county court, after a hearing of the matter, found that the values placed upon the estates, annuities and life estates were the true, fair and clear cash value of the same, and affirmed the order of the county judge therein. From this judgment of the county court the present appeal is prosecuted.

The assignment of errors, on appeal from the order of the county judge to the county court, alleged that the appraisement or assessment was against the evidence; that the county judge erred in placing an excessive valuation upon the personal property belonging to the estate; that the county judge erred in arbitrarily taking, as the fair market value of the stocks belonging to the said estate, the prices at which small amounts of the said stock sold at or about the time of the death of the said Silas B. Cobb; and that the statute, upon which said appraisement or assessment was based, is unconstitutional.

BENTLEY & BURLING, for appellants.

H. J. HAMLIN, Attorney General, (EDWIN W. SIMS, County Attorney, and FRANK L. SHEPARD, Assistant County Attorney, of counsel,) for the People.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—The act, known as the Inheritance Tax law of this State, has been decided, in a number of cases, to be constitutional; and, therefore, any further discussion of the question here would be unnecessary and fruitless.

(*Kochersperger* v. *Drake*, 167 Ill. 122; *Ayers* v. *Chicago Title and Trust Co.* 187 id. 42; *Billings* v. *People*, 189 id. 472; *Magoun* v. *Illinois Trust and Savings Bank*, 170 U. S. 283).

*Second*—The only other question, presented by the record, is whether the theory, followed by the appraiser in fixing the valuations of certain of the stocks belonging to the estate—said valuations having been adopted by the county judge—was the correct theory.

The inventory of the decedent's estate, giving the fair market value thereof, included the following items: 6327 shares of the capital stock of the Chicago City Railway Company at the market value of $265.00 per share, making $1,676,655.00; 500 shares of the capital stock of the Chicago West Division Railway Company at the market value of $650.00 per share, making $325,000.00; 2000 shares of the capital stock of the Diamond Match Company at $123.00 per share, making $246,000.00; 2500 shares of the capital stock of the South Side Elevated Railroad Company at the market value of $99.00 per share, making $247,500.00; 1000 shares of the preferred capital stock of the Metropolitan West Side Elevated Railroad Company at the market value of $81.50 per share, making $81,500.00; the total personal property aggregating $5,-829,819.96.

The proof shows that the valuations, placed upon the stocks in question as above indicated, were in accordance with the fair market value of the same; that is to say, that the figures above given as the market value of each share of the stocks in question are supported by the evidence. The only testimony in the case was that of three witnesses, whose depositions were attached to the report of the appraiser. The market value of the stocks, as shown by the testimony of these three witnesses who were called by the appellants, was evidenced by sales on the market. For example; the fair market value of 6327 shares of capital stock of the Chicago City railway was fixed by the appraiser at $265.00 per share. This

finding is supported by the public sales of that stock on
the Chicago Stock Exchange, as shown by the testimony
of the three witnesses so called by the appellants. Each
witness testified that the sales on the Chicago Stock Ex-
change ranged, on or about the date of the death of the
decedent, from $260.00 to $270.00 per share. The findings
of value per share as to the other stocks above named is
likewise supported by the testimony of these witnesses
as to sales of the same actually made. The testimony,
however, of these witnesses was to the effect, that the
market for the stocks of the five companies in question
is Chicago, and that the stocks are generally sold in
small lots of ten, twenty, fifty and one hundred shares.
The price of each share of stock, as above given, is the
price, at which sales of these stocks were effected on or
about the day of the death of the decedent.

But the witnesses stated that, if all the 6237 shares
of the Chicago City Railway Company stock should be
forced upon the market at one time, the price of the stock
would be diminished; in other words, that, if all the
shares together were thus forced to sale at one time, they
would bring a less price per share than a sale of an aver-
age number of shares, that is to say, of about fifty or
one hundred shares would bring. So, also, the testimony
was that the other shares of the other companies above
named, if forced to sale at one time, would bring less
than if sold in smaller quantities of fifty or one hundred
shares. In other words, the testimony is that the effect
of such action in forcing upon the market and forcing a
sale of such large blocks of stock would tend to depress
the market, and that the market price, thus depressed
by so precipitating upon the market such large quanti-
ties of stock, would be much lower than the price actu-
ally was, as evidenced by the sales in smaller lots which
actually occurred.

As we understand the position of counsel for appel-
lants, it is that the market price of these stocks should

have been fixed at the market price as it would be on a certain day, in case the entire holdings were forced upon the market, and a forced sale of the same was made with-out regard to the actual value of the stock per share, or the ordinary method of doing business in reference to handling, purchasing or selling the same. We are unable to concur in the correctness of this view.

The property here, valued as it was, was valued at the fair cash market value thereof. Fair market value, as applied to this case, is not what the stocks would bring at a forced sale, but what they would bring at a sale after due notice of the facts, and under fair condi-tions in the ordinary course of business. The Inheritance Tax law provides the method and machinery for the val-uation of property coming within the operation of the law. Section 1 of the statute uses the expression "clear market value of such property received by each person." Section 11 uses the phrases, "value," "fair market value," and "cash value." In arriving at the fair value of prop-erty, the appraiser, under the act, has to be guided by the fair market value thereof, and in ascertaining the same is authorized to call witnesses for that purpose. Under the act, the appraiser and the county judge and the county court are not limited in the valuation of prop-erty to the market quotations of the same, but, for the purpose of finding the fair cash value of the same, they may use the quotations of the same on the public ex-changes, private sales of such property, testimony as to the actual value of the same, and their own knowledge of the subject matter.

"Fair market value" has never been construed to mean the selling price of property at a forced or involuntary sale. In *Peoria Gaslight Co.* v. *Peoria Terminal Railway Co.* 146 Ill. 372, it was said (p. 377): "The theory, upon which evidence of sales of other similar property in the neigh-borhood at about the same time is held to be admissible, is that it tends to show the fair market value of the prop-

erty sought to be condemned. * * * But it seems very clear that, to have that tendency, they must have been made under circumstances where they are not compulsory, and where the vendor is not compelled to sell at all events, but is at liberty to invite competition among those desiring to become purchasers."

The very fact, that the market would be depressed by forcing large blocks of stock upon it, and forcing such large blocks of stock to sale, indicates that such a sale is not a proper test of the fair cash value of the stock.

It has been held in the State of New York, in passing upon the method adopted by an appraiser in his appraisement of large quantities of stocks and securities, that the correct rule was adopted where the appraiser based his appraisal upon public sales of securities at the stock exchange. (*In re Gould's Estate,* 46 N. Y. Sup. 506; *People v. Coleman,* 107 N. Y. 544).

In *In re Gould's Estate, supra,* it was said: "It is claimed, however, that the rule should be so construed that, when the value of large blocks of stock is involved, only the purchase and sale in markets of correspondingly large blocks of stock should be considered, upon the theory that such large blocks would necessarily sell at lower rates than small quantities of stock sold separately, and that throwing large blocks of stock upon the market all at once would have a tendency to produce a break in the market, and perhaps a total inability to get more than a mere nominal price offered for that stock. * * * Under the construction contended for, the securities involved in this proceeding might have been shown to be of little or no value, by considering that forcing them upon the market in large blocks at one time would break the market, and make them practically unsalable at all. The rule adopted by the appraiser was the correct rule, and he apparently applied it properly in determining the value of the large amount of securities belonging to the decedent's estate."

In *People* v. *Coleman, supra,* a case, which was decided by the New York court of appeals before the statute of 1891 upon which the case of *In re Gould's Estate, supra,* was based was passed in that State, the court say: "The market value of the shares of capital stock may sometimes be above and sometimes below the actual value. Such value may be greatly enhanced or depressed for speculative purposes, without any change in the actual value; but the market value of any stock, which is listed at the stock exchange in New York, and largely dealt in from day to day for a series of months, will usually furnish the best measure of value for all purposes. The competition of sellers and buyers, most of them careful and vigilant to take account of everything affecting value of stock in which they deal, and each mindful of his own interests, and seeking for some personal gain and advantage, will almost universally, if time sufficient be taken, furnish the true measure of the actual value of the stock."

The quotations of the stock exchange may be temporarily uncertain and untrustworthy, if the sales thereon are suddenly affected for speculative purposes, or by the forcing upon the market and to sale of large blocks of stock in an extraordinary manner with no explanation of such action, and where the purpose of it is left to the conjecture of those dealing in the stocks; but such quotations may be a fair and safe guide where they are taken for a reasonable period of sales made in the usual and ordinary course of business.

We are of the opinion that the findings, made by the appraiser in this case, and the order of the county judge fixing the value of the property of the estate, and the judgment of the county court affirming such findings upon appeal, were made upon the right basis and by the proper method.

Accordingly, the judgment of the county court is affirmed.                    *Judgment affirmed.*