CECIL H. GAMBLE, EXECUTOR OF THE ESTATE OF MARY H. GAMBLE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60840. Promulgated September 26, 1935.

*Laurence Graves, Esq.*, and *Ike Lanier, Esq.*, for the petitioner.
*Harold Allen, Esq., R. H. Transue, Esq.*, and *F. T. Donahoe, Esq.*, for the respondent.

OPINION.

LEECH: Petitioner, as executor of the estate of Mary H. Gamble, seeks redetermination of a deficiency of $496,693.26 in estate tax determined by respondent. The issues raised by the assignments of error are to be determined by the ascertainment of two facts: (a) Whether certain gifts made by petitioner's decedent within two years prior to her death, the value of which has been included by respondent in computing her net estate subject to tax, were made in contemplation of death within section 302 (c) of the Revenue Act of 1926, and (b) the value on January 5, 1929, of 21,641 shares of common stock of the Procter & Gamble Co. of Cincinnati, Ohio, respondent having included 6,143 shares of this stock, which had been made the subject of gifts by the decedent, 14,475 shares owned by her directly, and 1,023 shares in which she owned a four-fifteenths interest at the time of her death, at a value of $280 per share.

Certain facts were stipulated and, in addition, considerable testimony was introduced at the hearing. Upon the first issue it is shown that the decedent died on January 5, 1929, at the age of 73 years, following an illness of pneumonia of a virulent type, lasting six days. She was the widow of David B. Gamble and at the time of her death was possessed of a very large estate. The decedent was a woman of active mind and habits, devoting the greater part of her time to public welfare, educational, and religious work. She was a large contributor to various public activities and served actively in the management of a number of educational and religious enterprises.

Decedent left surviving her, three sons, Cecil H. Gamble, the petitioner, Sidney D. Gamble, and Clarence J. Gamble. She had, for many years, made her home in California but had a custom, each year, of visiting her sons who lived in the East. In October 1928 she came East and, while staying with her son, Clarence J. Gamble, in Philadelphia, Pennsylvania, she was taken ill with pneumonia and died. Decedent, in the two years prior to her death, made certain gifts which have been included by respondent in her gross estate, at a total value of $1,983,914.72, in determining the pending deficiency. These gifts and the dates thereof are as follows:

(1) February 8, 1927—55 shares of Procter & Gamble common stock to Louise G. Gamble, wife of petitioner.

(2) January 19, 1928—126 shares of Union Oil Associates to each of her three sons.

(3) February 16, 1928—152 shares of Gamble Co. common stock to each of her three sons.

(4) June 26, 1928—9 shares Cincinnati Time Recorder Co. stock to Cecil II. Gamble and 8 shares of that stock to each of her other two sons.

(5) June 28, 1928—1,170 shares Cincinnati Time Recorder Co. stock to Cecil II. Gamble and 1,172 shares each to Sidney D. Gamble and Clarence J. Gamble.

(6) November 21, 1928—to New York Trust Co. in trust for Blanche E. Wachob:

> 54 shares Cincinnati, New Orleans & Texas Pacific Ry. preferred stock
> 50 shares Cleveland Electric Illum. preferred stock
> 20 shares Dayton Power & Light Co. 6% preferred stock
> 50 shares New York, Chicago & St. Louis R. R. preferred stock
> 100 shares Pennsylvania Ohio Power & Light Co. preferred stock
> $5,000 Herschide Land Trust

(7) December 28, 1928—1,000 shares of Procter & Gamble common stock to each of her three sons.

(8) January 4, 1929—1,088 shares of Procter & Gamble common stock to Cecil H. Gamble, 1,000 shares to each of her other sons.

Of the common stock of the Procter & Gamble Co. included in the transfers of December 28, 1928, and January 4, 1929, 6,000 shares were transferred by the petitioner in compliance with directions given by the decedent in November 1928, some days prior to her last illness. The petitioner had charge of decedent's business affairs and, for some years, had made all transfers of stock for her under a general power of attorney held by him. The remaining 88 shares of this stock, included in the transfer of January 4, 1929, represented 80 shares of stock which had been given by decedent to Blanche E. Wachob in 1923, plus a stock dividend of 8 shares received thereon. These shares were merely transferred through decedent for the reason that Mrs. Wachob wished this stock to be included in the trust which had been created for her benefit by decedent.

It is unnecessary to set out the many facts established by the record and bearing upon the decedent's state of health and mind at the time these gifts in question were made and her purpose in making them. It will suffice to say that a careful study of these facts convinces us that the several gifts were not made by decedent in contemplation of death within the purview of section 302 of the Revenue Act of 1926. Not only does the proof indicate that petitioner was in good health for a woman of her age, at the time these gifts were made, but that her plans at that time contemplated active participation in various charitable and religious enterprises in the future. Definite and moving reasons for making the gifts, other than contemplation of death, are disclosed here.

The decedent had made many gifts of property to her three sons, of whom she was very fond. She was generous and thoughtful and had made numerous gifts of stocks and securities to individual friends and associates. Respondent has, however, only included in the gross state certain gifts made within the two years immediately preceding

her death. The gift of 55 shares of Procter & Gamble stock to her daughter-in-law, the wife of petitioner, is shown to have been for the purpose of helping in the furnishing of a new home which her son and his wife had just acquired. The Union Oil Associates stock, given her three sons on January 19, 1928, was speculative stock acquired by decedent from her husband's estate and required close observation. It was transferred to her sons at the suggestion of petitioner as were the transfers of 152 shares each of Gamble Co. stock. This latter corporation was organized for the purpose of holding securities of corporations and real estate foreign to the State of Ohio. The Cincinnati Time Recorder stock was transferred to her sons for the reason that decedent felt that responsibility for the management of this company was one that her sons should assume, practically all of the stock of the company having been owned by decedent's husband. Mrs. Wachob, for whom a trust was created, was a close friend of decedent and her companion. Decedent, in the past, had made her gifts of stock and we see in the circumstances surrounding this particular gift nothing more than a desire on the part of decedent for the comfort and welfare of this friend through possession of an independent income.

These transfers, together with the later transfer of 6,000 shares of Procter & Gamble common stock to her three sons, were discussed with her and advised by petitioner. Decedent was interested in her sons' active participation in charitable work and in their contributing to public enterprises financially as well as in services. The disputed gifts to those sons were made, in our opinion, for the purpose of making it possible for them, through an increase in their incomes, to take the active part in these public enterprises desired by decedent, and possibly to reduce decedent's income taxes. All of the gifts here in question were, in our opinion, of the same character and made for the same reasons influencing the making of many earlier gifts which were not and are not even asserted here to have been made by decedent in contemplation of death.

The respondent does not now, since the hearing of this proceeding, contend that the transfers in question were made in contemplation of death. He states in his brief: " In view of evidence presented at the hearing, respondent does not now urge this issue." We hold that the several gifts in question were not made by decedent in contemplation of death and their value is not subject to inclusion in the gross estate. *United States* v. *Wells*, 283 U. S. 102; *Vaughn* v. *Riordan*, 280 Fed. 742; *Safe Deposit & Trust Co.* v. *Tait*, 3 Fed. Supp. 51; *Off* v. *United States*, 35 Fed. (2d) 222; *Rea* v. *Heiner*, 6 Fed. (2d) 389; *Llewellyn* v. *United States*, 40 Fed. (2d) 555; *Delaware Trust Co.* v. *Handy*, 53 Fed. (2d) 1042.

With respect to the second issue, the value of the common stock of the Procter & Gamble Co. at the time of decedent's death, there is much testimony in the record, including that of expert witnesses.

The Procter & Gamble Co. was an old concern of established reputation and doing a large business in a class of necessities used in every household. It was established originally in 1837. It owned a number of subsidiary corporations. It manufactured Ivory Soap and Crisco, a cooking compound, and its production constituted approximately 39 percent of the hydrogenated lard substitutes and about 40 percent of the glycerin used in this country. The common stock had a par value of $20 per share. Its earnings on this common stock had increased from $6.90 per share for 1923 to $12.06 for 1928 and $14.83 for 1929. The regular dividend rate on the common stock in 1913 was 16 percent. This was consistently advanced to 20 percent in 1916, 25 percent in 1925, 35 percent in 1926, and 40 percent in 1927. In addition to these regular cash dividends, special cash dividends were paid in several of the years mentioned. Supplemental to these regular and special cash dividends, a stock dividend on the common stock was paid in each year from 1915 to 1929.

The book value per share of the common stock on June 30 of the years 1924 to 1929 was as follows:

| | | | |
|---|---|---|---|
| June 30, 1924 | $43.00 | June 30, 1927 | $51.13 |
| June 30, 1925 | 45.39 | June 30, 1928 | 54.43 |
| June 30, 1926 | 48.24 | June 30, 1929 | 58.95 |

The progress of the company had been rapid and consistent. In the year preceding decedent's death, the net earnings of the company, after payment of dividends on its preferred stock, interest on its bonds, and deducting reserves for depreciation, losses, and taxes, amounted to $15,068,074, and for the following year were $18,536,471. These earnings were available to the common stock of the company, which, in those two years, was outstanding in the amount of 1,250,000 shares, and of which, it must be remembered, a very substantial part had been issued in stock dividends.

On July 15, 1929, the Procter & Gamble Co. and J. P. Morgan & Co. of New York City executed an agreement under which the Procter & Gamble Co. agreed to increase its authorized common stock from 1,250,000 shares of $20 par value to 7,500,000 of no par value, to exchange 6,250,000 of the new no par common for the 1,250,000 shares of no par common and to list the new no par common on the New York Stock Exchange not later than August 7, 1929. This agreement also provided that the Procter & Gamble Co. would sell to J. P. Morgan & Co. 150,000 shares of the new no par common for $66⅔ per share and that J. P. Morgan & Co. should have an option to purchase 100,000 additional shares of such stock on or before February 12, 1930, at $80 per share. The 150,000 shares were

purchased at $66⅔ per share. The option mentioned was exercised. Negotiations leading up to this agreement started in February 1929, and the agreement incorporated in the instrument of July 15, 1929, was reached sometime after June 25, 1929. From June 1917 to June 29, 1929, the average price on the Cincinnati Stock Exchange, at which this common stock sold, was approximately $379 per share on sales of 1,444 shares. This common stock was not listed on the New York Stock Exchange, but was listed and sold on the Cincinnati Stock Exchange and in " over-the-counter " transactions by brokers on the New York Curb Exchange. Thirty-two thousand and fifty-one shares of this stock were sold on the Cincinnati Stock Exchange during 1928. On January 5, 1929, the date of decedent's death, there were 958 shares sold on that exchange. The value of $280 per share at which this stock was included for estate tax purposes by respondent, was its average price on the Cincinnati Exchange on that date.

Respondent premises the correctness of this action on the authority of section 302 of the Revenue Act of 1926, and article 13, Regulations 70, construing that section. Petitioner contends that, since the above statutory provision uses the term " value " and not " fair market value " as is used in income tax provisions of that act, the cited construing regulations are without statutory authority and that " value " as used in section 302, *supra*, means " real or true value based upon a sound economic determination."

It is not deemed necessary here to decide that contention. However, the soundness of such position is, at least, doubtful, in view of the consistent reenactment of prior similar provisions, all containing the word " value " and the substantially similar construing regulations. *Zellerbach Paper Co.* v. *Helvering*, 293 U.S. 172. Both the courts and this Board, under similar circumstances, have apparently interpreted the term as meaning " fair market value." *Ithaca Trust Co.* v. *United States*, 279 U.S. 151; *Laird* v. *Commissioner*, —— Fed. (2d) ——; affirming 29 B.T.A. 196; *Frank J. Kier*, 28 B.T.A. 633.

It is true that the Third Circuit Court of Appeals, in *Heiner* v. *Crosby*, 24 Fed. (2d) 191, held that determining fair market value of stock at a particular time in an income tax case was a question of fact in the determination of which actual sales, though evidentiary, were not always conclusive. It was there said that where such sales did not, because of their circumstances, signify a fair market value, resort should be had to other evidence to determine that fact, including competent opinion testimony. This rule was extended to include the determination of " value " in an estate tax case by the same Circuit Court in the case of *Laird* v. *Commissioner*, *supra*. That is the practical effect of paragraph 3 of the cited and applied regulations,

which paragraph petitioner also argues should be controlling here. But this record does not, in our judgment, establish any such circumstances surrounding the sales upon which the present disputed valuation was based.

The petitioner's argument from the testimony that the sale of a block of stock here involved would depress such a comparatively narrow market as that basing the questioned valuation, and thus constitute such a circumstance, has been refuted. *Walker* v. *People*, 192 Ill. 106; 61 N.E. 489. See *Ithaca Trust Co.* v. *United States*, *supra*. Particularly is this so where, as here, no sufficiently supporting evidence appears. *Frank J. Kier, supra*.

The petitioner's testimony that this common stock had a riskless loan value of $200 on the critical date is not convincing of the existence of those circumstances mentioned in the opinion of the court in *Heiner* v. *Crosby, supra*, and premising the application of the cited paragraph of the regulations. It does not tend to establish error in the pending determination. Nor is the evidence contained in the balance sheets of the company for 1929 and prior years, its earnings and dividend record for the same period, nor its prospects. The effect of both is quite the opposite.

Petitioner contends the contract, including the listing of petitioner's stock on the New York Stock Exchange, together with the sale and option to J. P. Morgan & Co., furnishes such support. We can not agree. That bare transaction, privately arranged and consummated, occurring some months after the basic date, and including not only a sale to J. P. Morgan & Co. of 150,000 shares upon a basis of $333 per share for the present stock but also an option, exercised shortly thereafter, for 100,000 shares on a basis of $400 per share, in our judgment, does not establish error in the respondent's determination. That transaction may, also, rather support it.

There was testimony that the sales prices on the Cincinnati Stock Exchange were incompetent or weakened as evidence of value for present purposes because that market was controlled to some extent through small-lot sales made for the purpose of forcing up the market. As to this, we are convinced neither of the existence of such a practice nor any substantial result affecting the present question, if it did exist. The records of sales of the Cincinnati Stock Exchange show that there was very little fluctuation in the price of Procter & Gamble common stock for some time before and after the basic date, and then the stock advanced in price.

Aside from the question of relevancy of the expert testimony here received, a careful consideration of it does not affect our conclusion.

Respondent's determination is presumed to be correct. Whether " value " as used in the applicable statutory provision means " fair market value " determinable under the controlling regulations, or

" real or true value based upon a sound economic determination " as contended by petitioner, the respondent's determination of a value of $280 per share for the Procter & Gamble common stock as of January 5, 1929, is sustained.

*Judgment will be entered under Rule 50.*